IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

DOLORES FORD,

                         Plaintiff,

        vs.                                    Civil Action No.
                                               02-CV-1056 (TJM/DEP)

JO ANNE B. BARNHART, Commissioner
of Social Security,

                         Defendant.

_____

APPEARANCES:                        OF COUNSEL:

FOR PLAINTIFF:

KELLY LAW FIRM                      RAYMOND J. KELLY, ESQ.
108 Bay Street
Manchester, New Hampshire 03104

FOR DEFENDANT:

HON. GLENN T. SUDDABY               WILLIAM H. PEASE, ESQ.
United States Attorney for the      Assistant U.S. Attorney
Northern District of New York
P.O. Box 7198
100 S. Clinton Street
Syracuse, NY 13261-7198

OFFICE OF GENERAL COUNSEL           BARBARA L. SPIVAK, ESQ.
Social Security Administration      Chief Counsel, Region II
26 Federal Plaza
New York, NY 10278                  SANDRA M. GROSSFELD, ESQ.
                                    Assistant Regional Counsel

DAVID E. PEEBLES
U.S. MAGISTRATE JUDGE

<u>REPORT AND RECOMMENDATION</u>

Plaintiff Dolores Ford, who suffers from a musculoskeletal impairment principally affecting her right shoulder and upper extremities, has commenced this proceeding seeking judicial review of the denial of her application for disability insurance and supplemental security income ("SSI") benefits.  Plaintiff maintains that the denial, which was based upon a finding that although she is incapable of fulfilling the requirements associated with her past employment, she retains the functional capacity to perform other available work, and thus is not disabled, lacks the support of substantial evidence in the record.  Arguing in favor of reversal, plaintiff maintains that in arriving at this determination the administrative law judge ("ALJ") who decided the matter improperly rejected the opinions of her treating physicians, erred in evaluating her mental impairment and failing to consider its effects when assessing plaintiff's residual functional capacity ("RFC"), and improperly discounted her subjective complaints of debilitating pain.

Based upon a thorough review of the record, and considering carefully the arguments advanced by the parties, I find that the

Commissioner's determination of no disability stems from the application of proper legal principles, and is adequately supported by substantial evidence in the record.  I therefore recommend that the agency's determination of no disability be affirmed, and plaintiff's complaint in this action be dismissed.

I.      BACKGROUND

Plaintiff was born on May 22, 1957; at the time of the administrative hearing in this matter, she was forty-three years of age.  Administrative Transcript at p. 299.[1]  The plaintiff is not married, and has two children under the age of eighteen.  AT 299-300.  Ms. Ford is a high school graduate.  AT 301.

Plaintiff, who in the past has collected workers' compensation benefits and currently receives child support from Social Services, *see* AT 301, was last employed in April of 2000 as a factory line worker.  AT 301. In that position, Ms. Ford worked as a packer/server off of the line machine.  AT 302.  All of plaintiff's past employment has consisted of similar work.  *Id.*

In or about June of 1998, plaintiff sustained a work related injury

---

[1]      Portions of the Administrative Transcript (Dkt. Nos. 10, 14), which was filed by the Commissioner, will be cited as "AT ___."

while piling thirty to fifty pound boxes slightly above shoulder level, resulting in the onset of pain to her right shoulder.  AT 173, 184, 246, 247. As a result of the injury plaintiff sought treatment from Dr. Herbert Savel, beginning in June of 1998, complaining of severe right shoulder pain which traveled up the right side of her neck and also caused headaches.[2] AT 247.  Plaintiff claimed that as a result of this pain she was unable to work, care for her younger child, or do housework.  AT 247.  Plaintiff also reported to Dr. Savel that she occasionally dropped things, was unable to carry objects with her right hand, and was forced to drive with her left hand.  *Id.*  Plaintiff was treated by Dr. Savel with various anti-inflammatory and analgesic medications, and was given exercises to improve the range of motion in her shoulder.  *Id.*

In September 1998, Dr. Savel noted that plaintiff exhibited severe symptoms in her right shoulder, and was experiencing only "very gradual improvement."  AT 248.  As a result, Ms. Ford was referred for physiotherapy to the Department of Rehabilitation Medicine at a hospital in Plattsburgh, New York.  AT 247.

---

[2]     The evidence is equivocal on the issue of when plaintiff first sought treatment from Dr. Savel.  *Compare* AT 246 ("this patient has been under my care since June of 1998[.]") with AT 247 ("Dolores Ford came to me on 7/10/98,complaining of pain in the right shoulder[.]").

-4-

During subsequent visits with Dr. Savel, plaintiff noted a lessening of the pain associated with her right shoulder, though with an increase in pain in the right side of her neck and a weakening of her right hand.  AT 244.  Plaintiff reported to Dr. Savel that she was still quite uncomfortable, and continued having difficulty sleeping at night and performing light household chores.  *Id.*  Magnetic resonance imaging ("MRI") testing of plaintiff's right shoulder, ordered by Dr. Savel in March of 2000, revealed no rotator cuff tear, but did show the presence of low grade rotator cuff tendinopathy, particularly anteriorly.  AT 251.

Among the physicians from whom plaintiff sought treatment for her shoulder injury was Craig B. DuMond, M.D., who saw Ms. Ford first on February 4, 1999, and for two years thereafter at varying intervals.  AT 173-84, 229, 239-41.  As a result of Dr. DuMond's examinations, most of which showed a relatively full range of motion, and testing, plaintiff was diagnosed as suffering from impingement syndrome, with no evidence of a rotator cuff tear.  AT 175, 178; *see also* AT 173, 175, 177, 178, 182, 184.  Addressing plaintiff's shoulder condition, Dr. DuMond took issue with the contrary findings of an independent medical examiner, *see* AT 178, assessing her condition as imposing a limitation upon lifting more than

twenty pounds, and noted that in his opinion plaintiff was capable of lifting

between sixty and eighty pounds provided that she was not required to

work with her hands and extremities out in front of her at shoulder level or

over her head.  AT 179.  In his reports, Dr. DuMond has regarded the

plaintiff as suffering from a disability, characterized as "moderate in

degree."  *E.g.*, AT 177.

It appears that over time plaintiff began to register complaints of

pain in the right side of her neck as well as the shoulder area.  AT 241.

MRI testing conducted in June of 2000 revealed some indication of disc

disease at C4-5, C5-6, and C6-7, with some evidence also of mild

encroachment on the neural foramina at those three levels in the right side

by hypertrophic osteophytes, but without evidence of any large herniation.

*Id.*  As a result of this finding Dr. DuMond did not consider the plaintiff to

be a suitable candidate for surgical intervention, instead recommending

continued management of her pain with medication.  *Id.*  Among the

medications prescribed by Dr. DuMond to address plaintiff's pain were

Naproxen, Neurontin, and Effexor.  AT 219.

Dr. Ronald Hargraves, another treating physician with a specialty in

neurosurgery, first examined the plaintiff for complaints of neck and

shoulder pain upon referral from Dr. Savel in April 2001.  AT 266.  A

cervical spine MRI scan ordered by Dr. Hargraves and conducted in July

2001 revealed stenosis at the C5-6 level, mostly off to the left side.  AT

266-67.  In a letter to Dr. Savel, Dr. Hargraves noted his belief that the

MRI results were inconsistent with plaintiff's symptomology.  AT 266.

Dr. Hargraves saw plaintiff for a follow-up visit on August 29, 2001,

at which time she complained of pain in the upper right extremity and sub

occipital headaches.  AT 266.  Dr. Hargraves found no surgical indications

at that time, but ordered an EMG nerve conducting exam due to concerns

about cervical radiculopathy and carpal tunnel. AT 285.  The results of

both diagnostic studies were essentially normal.  *Id.*

Plaintiff was seen by Dr. Hargraves again on October 24, 2001, at

which time he noted that plaintiff continued to experience pain and

discomfort in her neck and right side, and was being treated with

medications and physical therapy, to no avail.  AT 285.  Although on that

occasion Dr. Hargraves still recognized no surgical indications, he

acknowledged plaintiff's severe pain and inability to return to work due to

persistent symptomology, positing that if she were to return to work

discharge as a result of plaintiff's limitations would be inevitable.  *Id.*  Dr.

Hargraves responded to a questionnaire, apparently prepared by plaintiff's counsel, in October, 2001, reflecting his belief that plaintiff's reported symptoms and complaints were reasonable in light of her medical condition, and that plaintiff is not a malingerer.[3]  AT 286-86A.

In addition to seeing these treating sources, plaintiff and/or her records were examined consultatively by several individuals including Dr. Donald Kasprzak, who examined Ms. Ford on June 20, 2000.  AT 195-98. In his report of that examination, Dr. Kasprzak noted his findings of essentially a full range of motion, right shoulder pain of unclear etiology with questionable impingement, and questionable degenerative disease in the right shoulder.  AT 197-98.

Aside from her physical condition, plaintiff has also suffered from mental impairments of varying description and degrees.  Plaintiff was consultatively examined in June of 2000 by Dr. David Meeker, who diagnosed her as suffering from dysthymic disorder but noted a good prognosis and a recommendation that plaintiff obtain therapy to assist in dealing with her various relationships.  AT 192-94.  A psychiatric review

---

[3]       Dr. Hargraves' questionnaire response does not include an evaluation of the amount of time plaintiff is capable of conducting an array of activities in an eight hour work day.

form completed by Dr. Richard Weiss in July of 2000 for the purpose of assisting in the disability determination revealed that Ms. Ford had no severe mental impairment.  AT 199.  The examiner did, however, note a disturbance of mood evidenced by dysthymic disorder.  AT 202.

An RFC assessment was completed by a medical consultant in July of 2000, based upon an evaluation of plaintiff's medical records.  AT 210-17.  The evaluator determined that plaintiff could occasionally lift and/or carry twenty pounds, and frequently lift and/or carry ten pounds, and that she could stand and/or walk about six hours in an eight hour work day, sit for a total of six hours in an eight hour work day, and push and/or pull an unlimited amount of weight other than as shown for lift and/or carry.  AT 211.  That assessment did, however, note a limitation in reaching, reporting that plaintiff should avoid any overhead reaching involving her right side.  AT 213.  While in his RFC assessment the evaluator notes his agreement with Dr. Savel to the effect that overhead reaching would be problematic for the plaintiff, the evaluator asserts that plaintiff retains some residual functional capacity.[4]  AT 216.

---

[4]      The evaluator further noted that the classification of permanent partial disability offered by Dr. Savel is reserved for the discretion of the Commissioner, and was therefore given only partial weight in the assessment.  AT 216.

II.    PROCEDURAL HISTORY

A.    Proceedings Before The Agency

Plaintiff filed applications for disability insurance and SSI benefits in May of 2000, alleging a work related injury to the right shoulder and asserting a disability onset date of July 10, 1998.  AT 93-96, 291-93.  Plaintiff's applications for benefits were denied on July 27, 2000.  AT 59-65.

At plaintiff's request, a hearing was conducted with respect to the denial of her application for disability insurance and SSI benefits, beginning on May 14, 2001 and continuing on November 8, 2001, before ALJ Carl E. Stephan.  AT 31-58, 296-325.  Following those hearings, at which plaintiff was represented by counsel, ALJ Stephan rendered a decision dated December 13, 2001.  AT 11-17.  In his decision, ALJ Stephan applied the governing test for disability, finding that plaintiff has not engaged in substantial gainful activity since the alleged onset of her disability, and that since that time she has suffered from a musculoskeletal impairment of sufficient severity as to restrict her ability to perform basic work activities, but which fails to meet or equal the level of severity of any listed, presumptively disabling condition contained in the

-10-

governing regulations.  AT 13.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1.

ALJ Stephan went on to find that plaintiff's impairments do prevent her

from performing her past relevant work as a factory worker, inasmuch as

she is no longer able to engage in overhead work with the right upper

extremity.[5]  AT 13.

ALJ Stephan next concluded, based upon the various medical

findings, that plaintiff retains the RFC to perform work activity which

requires her to lift twenty pounds occasionally and ten pounds frequently,

and to perform only occasional reaching, pushing and pulling with the right

upper extremity, with no overhead lifting or reaching with the right upper

extremity.  AT 13, 16.  Applying that RFC determination to testimony

elicited from an impartial vocational expert, ALJ Stephan concluded that

jobs exist in significant numbers within the national economy which the

plaintiff has the capacity to perform.  AT 14-15.

When considering the medical evidence, ALJ Stephan noted his

rejection of certain reports of both Dr. Savel and Dr. Hargraves which

---

[5]       In his opinion, ALJ Stephan found evidence that plaintiff suffers from a
severe mental impairment to be missing from the record, based upon the lack of any
evidence of treatment for depressive symptoms and a corresponding diagnosis, as
well as the absence of any evidence that she suffers from symptoms which could
reasonably be expected to limit her ability to perform basic work related functions.  AT
13.

could be viewed as contradictory to his finding.  AT 14.  Specifically, ALJ

Stephan did not find an RFC assessment completed by Dr. Savel in

August of 2001, to the effect that the plaintiff is able to sit, stand, and walk

for no more than two hours in an eight hour work day, and can lift no more

than five pounds, to be well supported, and therefore opted not to give it

controlling weight.  AT 14.  ALJ Stephan explained the basis for that

rejection by noting that Dr. Savel's assessment was grossly inconsistent

with his own reports and clinical diagnostic studies, as well as with the

findings of other treating and examining sources.  *Id.*  ALJ Stephan also

rejected the opinion of Dr. Savel on the basis that it was predicated upon

the plaintiff's subjective allegations of functional debility.  Id.  For

essentially the same reasons, ALJ Stephan rejected a report written by Dr.

Hargraves in October, 2001, in which he opined that the plaintiff is

incapable of using her right shoulder for more than twenty minutes at a

time, experiences numbness after fifteen to twenty minutes, has a difficult

time holding her head in the downward tilted position, experiences

headaches four to five times per week requiring one to two hours of sleep,

and could regress physically with sustained activity.  AT 14.

     In his opinion, ALJ Stephan also discussed plaintiff's subjective

complaints of debilitating pain, finding that to be inconsistent with her daily activities and not well supported by the clinical and objective diagnostic evidence in the record.  AT 15-16.

The ALJ's determination became a final determination of the agency on June 14, 2002, when the Social Security Administration Appeals Council denied plaintiff's request for review of that decision.  AT 3-4.

B.    This Action

Plaintiff commenced this action on August 14, 2002.  Dkt. No. 1. Issue was thereafter joined by defendant's filing of an answer, accompanied by an administrative transcript of the proceedings before the agency, on January 29, 2003.  Dkt. Nos. 9, 10.  With the filing of a supplemental administrative transcript on June 3, 2003 (Dkt. No. 14), and briefs on behalf of the plaintiff on July 31, 2003 (Dkt. No. 20), and the Commissioner on August 21, 2003 (Dkt. No. 21), the matter is now ripe for determination, and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(Dkt. No.).  *See also* Fed. R. Civ. P. 72(b).[6]

_____

[6]    This matter has been treated in accordance with the procedures set forth in General Order No. 18 (formerly, General Order No. 43) which was issued by the

III.    DISCUSSION

A.    Scope of Review

A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited; that review requires a determination of whether the correct legal standards were applied, and whether the decision is supported by substantial evidence.  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002); *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Martone v. Apfel*, 70 F. Supp.2d 145, 148 (N.D.N.Y. 1999) (Hurd, J.) (citing *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987)).  Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, her decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  *Martone*, 70 F. Supp.2d at 148.  If, however, the correct legal standards have been applied and the ALJ's findings are supported by substantial evidence, those findings are conclusive, and the decision should withstand judicial

_____

Hon. Ralph W. Smith, Jr., then-Chief United States Magistrate Judge, on January 28, 1998, and amended and reissued by Chief District Judge Frederick J. Scullin, Jr., on September 19, 2001.  Under that General Order an action such as this is considered procedurally, once issue has been joined, as if cross-motions for judgment on the pleadings had been filed pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

scrutiny regardless of whether the reviewing court might have reached a contrary result if acting as the trier of fact.  *Veino*, 312 F.3d at 586; *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988); *Barnett v. Apfel*, 13 F. Supp.2d 312, 314 (N.D.N.Y. 1998) (Hurd, M.J.); *see also* 42 U.S.C. § 405(g).

The term "substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 217 (1938)).  To be substantial, there must be "'more than a mere scintilla'" of evidence scattered throughout the administrative record.  *Id.*; *Martone*, 70 F. Supp.2d at 148 (citing *Richardson*).  "To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams*, 859 F.2d at 258 (citing *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 715 S. Ct. 456, 464 (1951)).

When a reviewing court concludes that incorrect legal standards

have been applied, and/or that substantial evidence does not support the agency's determination, the agency's decision should be reversed.  42 U.S.C. § 405(g); *see Martone*, 70 F. Supp.2d at 148.  In such a case the court may remand the matter to the Commissioner under sentence four of 42 U.S.C. § 405(g), particularly if deemed necessary to allow the ALJ to develop a full and fair record or to explain his or her reasoning.  *Martone*, 70 F. Supp.2d at 148 (citing *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)).  A remand pursuant to sentence six of section 405(g) is warranted if new, non-cumulative evidence proffered to the district court should be considered at the agency level.  *See Lisa v. Sec'y of Dept. of Health & Human Servs. of U.S.*, 940 F.2d 40, 43 (2d Cir. 1991).  Reversal without remand, while unusual, is appropriate when there is "persuasive proof of disability" in the record and it would serve no useful purpose to remand the matter for further proceedings before the agency.  *Parker*, 626 F.2d at 235; *Simmons v. United States R.R. Retirement Bd.*, 982 F.2d 49, 57 (2d Cir. 1992); *Carroll v. Sec'y of Health & Human Servs.*, 705 F.2d 638, 644 (2d Cir. 1983).

B.      Disability Determination - The Five Step Evaluation Process

The Social Security Act defines "disability" to include the "inability to

engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to

result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months[.] "  42 U.S.C. §

423(d)(1)(A).   In addition, the Act requires that a claimant's:

> physical or mental impairment or impairments
> [must be] of such severity that he is not only
> unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of substantial
> gainful work which exists in the national economy,
> regardless of whether such work exists in the
> immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he
> would be hired if he applied for work.

*Id.* § 423(d)(2)(A).

The agency has prescribed a five step evaluative process to be

employed in determining whether an individual is disabled.  *See* 20 C.F.R.

§§ 404.1520, 416.920.  The first step requires a determination of whether

the claimant is engaging in substantial gainful activity; if so, then the

claimant is not disabled, and the inquiry need proceed no further.  *Id.* §§

404.1520(b), 416.920(b).  If the claimant is not gainfully employed, then

the second step involves an examination of whether the claimant has a

severe impairment or combination of impairments which significantly

-17-

restricts his or her physical or mental ability to perform basic work activities. *Id.* §§ 404.1520(c), 416.920(c). If the claimant is found to suffer from such an impairment, the agency must next determine whether it meets or equals an impairment listed in Appendix 1 of the regulations. *Id.* §§ 404.1520(d), 416.920(d); *see also id.* Part 404, Subpt. P, App. 1. If so, then the claimant is "presumptively disabled". *Martone*, 70 F. Supp.2d at 149 (citing *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984)); 20 C.F.R. §§ 404.1520(d), 416.920(d).

If the claimant is not presumptively disabled, step four requires an assessment of whether the claimant's residual functional capacity ("RFC") precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). If it is determined that it does, then as a final matter the agency must examine whether the claimant can do any other work. *Id.* §§ 404.1520(f), 416.920(f).

The burden of showing that the claimant cannot perform past work lies with the claimant. *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996); *Ferraris*, 728 F.2d at 584. Once that burden has been met, however, it becomes incumbent upon the agency to prove that the claimant is capable of performing other work. *Perez*, 77 F.3d at 46. In deciding whether that

-18-

burden has been met, the ALJ should consider the claimant's RFC, age, education, past work experience, and transferability of skills.  *Ferraris*, 728 F.2d at 585; *Martone*, 70 F. Supp.2d at 150.

      C.    <u>The Evidence In This Case</u>

      The ALJ's finding of no disability is predicated upon his belief that the plaintiff retains the RFC to perform work activity which requires her to lift twenty pounds occasionally, and ten pounds frequently, with only occasional reaching, pushing and pulling, and no overhead reaching, which involves her right upper extremity.  AT 16.  Applying this RFC finding to testimony provided by a vocational expert, the ALJ found jobs existing in sufficient numbers within the national and local economies which the plaintiff is capable of performing.  AT 17.  Plaintiff assails the ALJ's determination as contradicted by the opinions of treating sources, Dr. Savel and Dr. Hargraves, and incompatible with her complaints of debilitating pain.  Plaintiff also asserts that the ALJ's finding does not account for nonexertional limitations associated with her chronic headaches and mental condition.

      1.    <u>RFC Determination</u>

      A claimant's RFC represents a finding of the range of tasks he or

she is capable of performing notwithstanding the impairments at issue. 20 C.F.R. § 404.1545(a). An RFC determination is informed by consideration of a claimant's physical abilities, mental abilities, symptomology, including pain, and other limitations which could interfere with work activities on a regular and continuing basis. *Id.*; *Martone*, 70 F. Supp.2d at 150.

To properly ascertain a claimant's RFC, an ALJ must therefore assess plaintiff's exertional capabilities, addressing his or her ability to sit, stand, walk, lift, carry, push and pull. 20 C.F.R. § 404.1569a. Nonexertional limitations or impairments, including impairments which result in postural and manipulative limitations, must also be considered. 20 C.F.R. § 404.1569a; *see also* 20 C.F.R. Part 404, Subpt. P, App. 2 § 200.00(e). When making an RFC determination, an ALJ must specify those functions which the claimant is capable of performing; conclusory statements concerning his or her capabilities, however, will not suffice. *Martone*, 70 F. Supp.2d at 150 (citing *Ferraris*, 728 F.2d at 587). An administrative RFC finding can withstand judicial scrutiny only if there is substantial evidence in the record to support each requirement listed in the regulations. *Martone*, 70 F. Supp.2d at 150 (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Sobolewski v. Apfel*, 985 F.Supp.

300, 309-10 (E.D.N.Y. 1997).

In this case, there is substantial evidence in the record to support the ALJ's finding of plaintiff's ability to perform work activity which requires her to lift twenty pounds occasionally, ten pounds frequently, perform only occasional reaching pushing and pulling with the right upper extremity, and work that requires no overhead reaching with the right upper extremity.  AT 16.  Over the course of time various health care professionals have noted plaintiff's ability to perform at such a level.  *See*, *e.g.*, AT 176, 179, 185 (Dr. DuMond); AT 210-17 (disability reviewer D. Montavon).  Indeed, in May of 1999 Dr. DuMond, plaintiff's specialist, indicated his belief that the twenty pound weight lifting restriction referenced by another consultative examiner was "unrealistic" and that plaintiff was capable of lifting, from floor to bench level, between sixty and eighty pounds.  AT 179.  Accordingly, leaving aside issues associated with the contrary opinions of Dr. Savel, AT 248, 258-60, 263, and Dr. Hargraves, AT 285-86A, and plaintiff's subjective complaints of debilitating pain precluding her ability to perform any type of work, the ALJ's RFC finding is supported by substantial evidence.

2.    Treating Physician

In support of her challenge to the ALJ's no disability determination, the plaintiff challenges the ALJ's rejection of the opinions of two of her treating professionals regarding her functional capacity, including Dr. Savel, who initially treated her after her injury and continued to monitor her progress thereafter, and Dr. Hargraves, to whom she was referred by Dr. Savel.

Ordinarily, the opinion of a treating physician is entitled to considerable deference, provided that it is supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence.[7]  *Veino*, 312 F.3d at 588; *Barnett*, 13 F. Supp.2d at 316.  Such opinions are not controlling,

---

[7]     The regulation which governs treating physicians provides:

> Generally, we give more weight to opinions from your treating sources . . . If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply [various factors] in determining the weight to give the opinion.

20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

however, if contrary to other substantial evidence in the record.  *Veino*,

312 F.3d at 588.  Where conflicts arise in the form of contradictory

medical evidence, their resolution is properly entrusted to the

Commissioner.  *Id.*

In deciding what weight, if any, an ALJ should accord to medical

opinions, he or she may consider a variety of factors including "[t]he

duration of a patient-physician relationship, the reasoning accompanying

the opinion, the opinion's consistency with other evidence, and the

physician's specialization or lack thereof[.]"  *See Schisler v. Sullivan*, 3

F.3d 563, 568 (2d Cir. 1993) (discussing 20 C.F.R. §§ 404.1527,

416.927).

When a treating physician's opinions are repudiated, the ALJ must

provide reasons for the rejection.  20 C.F.R. §§ 404.1527(d)(2),

416.927(d)(2).  Failure to apply the appropriate legal standards for

considering a treating physician's opinions is a proper basis for reversal

and remand, as is the failure to provide reasons for rejection of his or her

opinions.  *Johnson*, 817 F.2d at 985; *Barnett*, 13 F. Supp.2d at 316-17.

In October of 2000 Dr. Savel wrote that the plaintiff is incapable of

performing any significant type of work because the pain in her right

-23-

shoulder flares up even after doing light housework.  AT 248.  Later, in

August of 2001, Dr. Savel opined that plaintiff was only able to sit, stand,

and walk for up to two hours in an eight hour workday, and could lift no

more than five pounds.  AT 258.  In his functional capacity reports of

August 2001 and October 2001, Dr. Savel also noted that plaintiff could

use her right shoulder for no more than twenty minutes at a time,

experienced numbness after fifteen to twenty minutes, had a difficult time

holding her neck in the downward tilted position, and experienced

headaches four to five times per week which require one to two hours of

sleep, and that her condition could regress physically with sustained

activity.  AT 259, 263, 286-86A.

        ALJ Stephan's rejection of the findings of Dr. Savel is both

adequately explained, and well supported by evidence in the record.

While Dr. Savel's report ascribes limitations upon Ms. Ford's ability to sit,

stand or walk, as the ALJ notes nothing from plaintiff's description of her

symptomology or clinical evidence in the record suggests any such

limitation on those capabilities.  *See* AT 14.  Similarly, Dr. Savel's RFC

findings are inconsistent with a December 2, 1999 report in which Dr.

DuMond wrote that the claimant had virtually a full range of motion, and in

any event no more than a fifteen percent loss of function in the upper right extremity.[8]  AT 175-76.

ALJ Stephan's rejection of the opinions of plaintiff's treating physicians was based in no small part upon the fact that they are predicated upon plaintiff's subjective complaints, and find little or no support in clinical findings or diagnostic studies.  AT 14.  Indeed, as ALJ Stephan points out, Dr. Hargraves' own reports fail to support his functional capacity assessment of the plaintiff.  AT 14; *see* AT 266.  After examining the plaintiff in August of 2001, Dr. Hargraves reported that her MRI scan did not match her symptoms, and the doctor saw no surgical indications for her cervical spine.  AT 266.  Following that visit, Dr. Hargraves ordered an EMG, since the plaintiff exhibited what he thought were symptoms of carpal tunnel syndrome.  *Id.*  In October of 2001, after a follow-up exam, Dr. Hargraves reported that the results of the EMG were normal, and surgery was still not an indication in plaintiff's case.  AT 285.  In reports of both visits with the plaintiff, Dr. Hargraves noted her

---

[8]      The ALJ mistakenly refers to that report as having been prepared in November, 1999.  *See* AT 14.  The ALJ's opinion also alludes to a March, 2001 recommendation by Dr. Savel, to the effect that plaintiff need only avoid "heavy lifting and overhead work."  AT 14.  That report, however, does not appear to be included in the record.

subjective allegations of pain, and in the latter communication to plaintiff's counsel, Dr. Hargraves wrote that he had no reason to doubt her ongoing inability to work despite lack of a diagnosis or clinical findings to support her symptomology.  AT 266, 285.

It was within the ALJ's discretion to give more weight to the opinions of Dr. DuMond and Dr. Kasprzak, which he determined to be more consistent with the record as a whole, than the opinions of Dr. Hargraves. 20 C.F.R. §§ 404.1527(d)(4), 416.927(d)(4).  As ALJ Stephan pointed out in his opinion, the more restrictive assessments now urged by the plaintiff are at odds with reports of Dr. DuMond, who treated the patient for a significant period in an attempt to address her injury.  AT 14.  Significantly, in May of 1999 Dr. DuMond described the plaintiff as partially disabled, and noted that she was capable of returning to work and lifting between sixty and eighty pounds without aggravation to her shoulder injury, provided that she could avoid overhead work.  AT 14, 178-79.  As the ALJ also noted, Dr. Kasprzak has described plaintiff's symptomology as of unclear etiology.  AT 14, 198.

Having reviewed the record, I find ALJ Stephan did not apply improper legal standards in exercising his discretion to disregard certain

-26-

reports of plaintiff's treating physicians, including those opinions on the ultimate issue of disability, *see* 20 C.F.R. § 404.1527(e)(1); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) (citing 20 C.F.R. § 404.1527(e), which were inconsistent with the record as a whole and based largely on plaintiff's subjective complaints.  Additionally, I find that ALJ Stephan sufficiently articulated the reasons for his rejection of the opinions of those treating sources.[9]

> 3.   Pain

In further support of her appeal, plaintiff challenges the ALJ's rejection of her claims of debilitating pain.  During the hearing in this matter, plaintiff testified concerning the pain which she experiences on a daily basis, including pain and swelling in her right shoulder, numbness

---

[9]   In her brief, plaintiff argues that the ALJ was required to recontact Dr. Savel and Dr. Hargraves for clarification if troubled by their opinions.  *See* Plaintiff's Brief (Dkt. No. 17) at 26.  Such an obligation arises, however, only when there are clear gaps in the administrative record and the evidence before the ALJ is inadequate to support a finding of disability.  20 C.F.R. §§ 404.1512(e), 416.912(e); *Colondres v. Barnhart*, No. 04 Civ. 1841, 2005 WL 106893, at *7 n.100 (S.D.N.Y. Jan 18, 2005); *see also Rosa v. Callahan*, 168 F.3d 72, 78-80 (2d Cir. 1999) (holding the ALJ improperly rejected the treating physician's prognosis where there appeared to be many missing records of the treating physician's appointments with the claimant from the administrative record).  The ALJ had before him extensive treatment notes from Dr. Savel as well as various reports of Dr. Hargrave's examination of her.  *See*, *e.g.*, AT 244-48, 266, 285, 286-86A.  Accordingly, there was no such gap in the record, and the ALJ thus was not required to recontact those treating sources.

down her right arm and hand, and pain in her neck.[10]  AT 305-06.  Plaintiff

has attempted to address her pain through medication, without significant

success.[11]  AT 358.  That rejection was based principally upon the lack of

clinical evidence supporting the degree of limitation alleged by the

claimant.  *See* AT 15-16.

An ALJ must take into account subjective complaints of pain in

making the five step disability analysis.  20 C.F.R. §§ 404.1529(a), (d),

416.929(a), (d).  When examining the issue of pain, however, the ALJ is

not required to blindly accept the subjective testimony of a claimant.

*Marcus*, 615 F.2d at 27; *Martone*, 70 F. Supp.2d at 151 (citing *Marcus*).

Rather, an ALJ retains the discretion to evaluate a claimant's subjective

testimony, including testimony concerning pain.  *See Mimms v. Heckler*,

750 F.2d 180, 185-86 (2d Cir. 1984).  In deciding how to exercise that

discretion the ALJ must consider a variety of factors which ordinarily

would be relevant on the issue of credibility in any context, including the

claimant's credibility, his or her motivation, and the medical evidence in

---

[10]     Plaintiff also suffers from severe headaches three to four times a week
as a result of her neck pain, requiring her to take medication and lie down for an hour
or so.  AT 306.

[11]     At the time of the hearing plaintiff testified she had been taking Relafen,
Neurontin, and Effexor for the prior two years.  AT 304-05.

the record.  *See Sweatman v. Callahan*, No. 96-CV-1966, 1998 WL

59461, at *5 (N.D.N.Y. Feb. 11, 1998) (Pooler, D.J. and Smith, M.J.)

(citing *Marcus*, 615 F.2d at 27-28).  In doing so, the ALJ must reach an

independent judgment concerning the actual extent of pain suffered and

its impact upon the claimant's ability to work.  *Id.*

When such testimony is consistent with and supported by objective

clinical evidence demonstrating that claimant has a medical impairment

which one could reasonably anticipate would produce such pain, it is

entitled to considerable weight.[12]  *Barnett*, 13 F. Supp.2d at 316; *see also*

20 C.F.R. §§ 404.1529(a), 416.929(a).  If the claimant's testimony

concerning the intensity, persistence or functional limitations associated

with his or her pain is not fully supported by clinical evidence, however,

then the ALJ must consider additional factors in order to assess that

testimony, including: 1) daily activities; 2) location, duration, frequency and

intensity of any symptoms; 3) precipitating and aggravating factors; 4)

type, dosage, effectiveness and side effects of any medications taken; 5)

other treatment received; and 6) other measures taken to relieve

---

[12]     In the Act, Congress has specified that a claimant will not be viewed as
disabled unless he or she supplies medical or other evidence establishing the
existence of a medical impairment which would reasonably be expected to produce the
pain or other symptoms alleged.  42 U.S.C. § 423(d)(5)(A).

symptoms.  20 C.F.R. §§ 404.1529(c)(3)(i)-(vi), 416.929(c)(3)(i)-(vi).

After considering plaintiff's subjective testimony, the objective medical evidence, and any other factors deemed relevant, the ALJ may accept or reject claimant's subjective testimony.  *Martone*, 70 F. Supp.2d at 151; *see also* 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  If such testimony is rejected, however, the ALJ must explicitly state the basis for doing so with sufficient particularity to enable a reviewing court to determine whether those reasons for disbelief were legitimate, and whether the determination is supported by substantial evidence.  *Martone*, 70 F. Supp.2d at 151 (citing *Brandon v. Bowen*, 666 F. Supp. 604, 608 (S.D.N.Y. 1987)).  Where the ALJ's findings are supported by substantial evidence, the decision to discount subjective testimony may not be disturbed on court review.  *Aponte v. Sec'y, Dept. of Health & Human Servs. of U.S.*, 728 F.2d 588, 591 (2d Cir. 1984).

It may be, as plaintiff asserts, that she does suffer from some degree of discomfort as a result of her right shoulder condition.  The fact that she suffers from discomfort, however, does not automatically qualify her as disabled, since "disability requires more than mere inability to work without pain."  *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d Cir. 1983).

The ALJ's rejection of plaintiff's subjective allegations of pain, based principally upon the lack of clinical and diagnostic support, is well supported and adequately explained in his decision.  AT 15-16.  With regard to clinical findings, ALJ Stephan noted that 1) upon examination plaintiff regularly has exhibited full range of motion in the right upper extremity, 2) there is no evidence of muscle atrophy or spasms, 3) she exhibits good strength, and 4) plaintiff appears to be capable of performing internal and external rotation without limits.  AT 15.  ALJ Stephan also notes in support of his finding that Dr. Kasprzak determined that plaintiff's symptoms are of unclear etiology, with the only positive clinical finding being tenderness, which can fairly be characterized as subjective.  *Id.*  ALJ Stephan also cited the results of the host of diagnostic studies performed on the plaintiff, including an arthrogram of the right shoulder, an MRI scan of the cervical spine, and EMG studies, none of which yielded results which would be reasonably expected to produce the symptoms alleged.[13]  AT 15-16.

Based on the foregoing, I find that the ALJ appropriately stated the

---

[13]     In his decision, the ALJ also expressed doubts concerning plaintiff's motivation to return to gainful employment, noting that she was collecting workers' compensation benefits at the time of the hearing.  AT 16.

basis for his rejection of the plaintiff's testimony with sufficient particularity, and that his skepticism regarding the degree of pain experienced by the plaintiff, and resulting rejection of her subjective testimony, is supported by substantial evidence.

### 4.   Plaintiff's Mental Condition

In support of her request to overturn the finding of no disability, plaintiff also argues that the ALJ erred in evaluating her mental impairment.

Where an alleged disability consists of a mental impairment, a special procedure is followed at each level of administrative review.  20 C.F.R. §§ 404.1520a; *Martone*, 70 F. Supp.2d at 149.  First, the Commissioner records the pertinent signs, symptoms, findings, functional limitations, and effects of treatments contained in the record.  *Id.*  If a mental impairment is determined to exist, the Commissioner must next indicate whether certain medical findings which have been found especially relevant to the ability to work are present or absent.  *Id.*  The Commissioner then rates the degree of functional loss resulting from the impairment – on a scale ranging from no limitation to severe limitation, which is incompatible with the ability to do work-like functions – analyzing

four factors: 1) activities of daily living; 2) social functioning;  3) concentration, persistence, and pace; and 4) deterioration or decompensation in work or work-like settings.  *Id.*  The Commissioner must then determine the severity of the mental impairment, and whether it meets or equals a listed mental disorder.  *Id.*  If the impairment is severe, but does not meet or equal a listed mental disorder, the Commissioner analyzes the claimant's RFC, considering whether the claimant has a limited ability to carry out certain mental activities – such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting – that may reduce his or her ability to do past work and other work.  *See* 20 C.F.R. §§ 404.1520a, 404.1545(c).

When evaluating the severity of mental impairments, the ALJ is required to use a Psychiatric Review Technique Form ("PRTF").  *See* 20 C.F.R. §§ 404.1520a(e).  The PRTF lists the signs, symptoms and other medical findings which establish the existence of the mental impairment and is also used to rate the degree of functional loss resulting from the mental impairment.  20 C.F.R. § 404.1520a(e).

In this instance the ALJ considered evidence in the record, and

concluded that plaintiff does not suffer from any functional limitations as a result of any mental disorder.  AT 13.  The record, while suggesting the existence of some degree of mental impairment as a result of a mood disorder, contains substantial evidence to support this determination.

Plaintiff was consultatively examined by Dr. David Meeker, a psychiatrist, on June 19, 2000 for the purpose of New York State disability determination.  *See* AT 192-94.  Dr. Meeker noted that during the examination plaintiff's mood and affect were mildly dysphoric.  AT 12.  Dr. Meeker diagnosed plaintiff as suffering from a dysthymic disorder and although noting that the prognosis seemed good, recommended some therapy for her and her children to assist them in coping with their difficult relationships.  AT 194.  A Psychiatric Review Technique Form was completed by Dr. Weiss in July of 2000 for the purpose of plaintiff's Social Security disability determination; in that form, the doctor noted a disturbance of mood as evidenced by dysthymic disorder but determined that plaintiff does not have a severe mental impairment,  AT 199-209. Other than the fact that Dr. Savel has prescribed Effexor to alleviate plaintiff's depressive symptoms and anxiety, there is no other evidence in the record which suggests the existence of a severe mental impairment

-34-

which would limit the plaintiff's functional abilities.  AT 308.

It is true that although not rising to a level sufficient to independently support a finding of disability, a mental condition presents a nonexertional impairment which can bear upon a claimant's RFC.  20 C.F.R. § 404.1545(c).  In this case, however, the record is devoid of any evidence to suggest that plaintiff's mental condition imposed limitations beyond those recognized in the ALJ's RFC finding, and upon which the determination of no disability was premised.  Accordingly, the presence of a mental condition does not present a nonexertional limitation which would undermine a finding of no disability.

In sum, there is substantial evidence in the record to support ALJ Stephan's determination that plaintiff is not suffering from a severe mental impairment which could reasonably be expected to limit her ability to perform basic work related functions, or to limit her RFC beyond the bounds recognized by the ALJ in his decision.

### 5.    Testimony of Vocational Expert

_____Plaintiff also takes issue with the ALJ's acceptance of the testimony of vocational expert Anthony Salerno, who opined that jobs capable of being performed by the plaintiff exist in sufficient numbers in the national

and local economies.  AT 50-51.

It is well established that elicitation of testimony from a vocational expert is a proper means of fulfilling the agency's burden at step five of the disability test to establish the existence of jobs in sufficient numbers in the national and regional economy that plaintiff is capable of performing. *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986); *Dumas v. Schweiker*, 712 F.2d 1545, 1553-54 (2d Cir. 1983); *Dwyer v. Apfel*, 23 F. Supp.2d 223, 229-30 (N.D.N.Y. 1998) (Hurd, M.J.) (citing *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)); *see also* 20 C.F.R. §§ 404.1566, 416.966. Use of hypothetical questions to develop the vocational expert's testimony is also permitted, provided that the questioning precisely and comprehensively includes each physical and mental impairment of the claimant accepted as true by the ALJ.  *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).  If the factors set forth in the hypothetical are supported by substantial evidence, then the vocational expert's testimony may be relied upon by the ALJ in support of a finding of no disability.  *Id.*

During the hearing, the ALJ posed the following hypothetical to the Vocational Expert:

Q. I would like you to assume we have the [inaudible] individual. And this individual has a high school education and the exact same past relevant work as the claimant. Let us assume this individual is capable of lifting and carrying at the light exertional level that is occasionally 20 pounds and frequently 10, this individual is right handed and because limitations of the individual[']s right upper extremity, the individual would be precluded from work requiring– I'm sorry, they would not be able to do work requiring any overhead lifting – so they can do no overhead lifting.  Or reaching with the right upper extremity.

\*    \*    \*

Q.  They could occasionally reach in other directions with that right upper extremity.  And they could occasionally, only, push or pull with the right upper extremity.  And taking into account these restrictions, could this individual return to any of the claimant[']s past, relevant work?

A.  No sir.

Q.  Okay.  Would there be any other jobs in the national or regional economy that such an individual could perform?

AT 49-50.  In response, the witness identified five suitable positions consistent with the hypothetical individual's RFC, including as a school bus monitor, a teacher's aide, flagger, a school crossing guard, and a crossing tender, and indicated that all five exist in sufficient numbers both nationally, and in the local economy.  AT 50-51.

The ALJ then went on to refine the hypothetical, the only change being that the subject individual is restricted in the use of his or her right hand to five-minute durations, functionally restricting the description with respect to fine manipulation.  AT 50-51. The expert replied that his prior testimony would not change, as fine manipulation was not a requirement for the  positions identified.  AT 52.

The ALJ next further refined the inquiry by limiting the hypothetical individual's lifting capacity to sedentary, thereby essentially imposing a restriction in lifting and carrying up to ten pounds only occasionally.  AT 52.  The expert responded that the individual in this version of the hypothetical could work as a cashier where lifting is not a requirement, including in a tollbooth, theater, sports arena, parking ramp and garage, off track betting establishment, and self-serve gas station.  AT 52. According to the expert, there are approximately 350 such jobs in the regional economy, and 100,000 nationally.  AT 53.  The expert additionally stated that this individual could also work in the printing industry, performing binding and collating, noting that such positions also exist in sufficient numbers in the national and local economy.  *Id.*

In his final hypothetical, the ALJ posited the same restrictions as

previously noted, but again limited the individual's use of hands to only occasional fine manipulation.  AT 53-54.  The expert responded that his testimony in response to the previous hypothetical would remain the same even under those more limiting circumstances.  AT 54.

Plaintiff claims that the hypotheticals posed by the ALJ were defective, in that they did not consider plaintiff's numbness in her arm and weakness in her hand, her headaches, her difficulty tilting her head downward, and her mental impairment.  Plaintiff's Brief (Dkt. No. 17) at 40. Plaintiff also asserts that ALJ Stephan's failure to rely on the functional assessment of plaintiff's treating sources was also error.  *Id.*

In order for the vocational expert's testimony to be a reliable basis for the ALJ's decision finding of no disability, the hypothetical posed must include only those mental and physical functional limitations which are supported by the record.  *See Horbock v. Barnhart*, 210 F.Supp. 2d 125, 134-36 (D. Conn. 2002); *see also* 20 C.F.R. § 404.1520(f).  As has previously been discussed, it was within ALJ Stephan's discretion to reject both plaintiff's subjective complaints regarding her disabling symptoms and the doctors' reports which were largely based on those subjective complaints and lacked support in clinical findings or diagnostic studies.

*See Molina v. Apfel*, 43 F.Supp.2d. 192, 205 (D. Conn. 1999).  Further, as was discussed above, plaintiff's claim of a severe mental impairment is not supported by substantial evidence in the record.

Despite plaintiff's assertions to the contrary, substantial evidence in the record amply supports the assumptions included within the hypothetical posed to the vocational expert, and the ALJ was not required to include symptomology previously deemed to not be supported by the record.  Accordingly, the ALJ's step five finding is not, as plaintiff asserts, legally defective.

IV.   SUMMARY AND RECOMMENDATION

In determining that the plaintiff retains the RFC to perform work activity which requires her to lift twenty pounds occasionally, and ten pounds frequently, and to perform only occasional reaching, pushing and pulling with the right upper extremity, with no overhead reaching with the right upper extremity, the ALJ properly considered and weighed the medical evidence in the record.  In this regard, plaintiff's rejection of the arguably contrary reports of Dr. Savel and Dr. Hargraves was proper, and well supported.  Further, the ALJ properly assessed and rejected plaintiff's subjective complaints of debilitating pain, in large part based upon the

lack of clinical evidence of a medical condition which could be susceptible of proving such pain.  ALJ Stephan also did not improperly overlook plaintiff's mental deficiency, inasmuch as the record supports his determination that it was not so severe that it could reasonably be expected to limit her ability to perform basic work related functions, nor is there evidence that it affected plaintiff's RFC by limiting her capabilities beyond those bounds discussed by the ALJ.  In addition, the ALJ did err in his reliance on the testimony of the vocational expert when reaching his decision, as the hypotheticals posed were supported by substantial evidence in the record.

Based upon the foregoing, it is hereby

RECOMMENDED that defendant's motion for judgment on the pleadings be GRANTED, that the Commissioner's determination of no disability be AFFIRMED, and that plaintiff's complaint in this action be DISMISSED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court within ten (10) days.  FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW.

28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72; *Roland v. Racette*, 984 F.2d q85 (2d Cir. 1993).

IT IS FURTHER ORDERED, that the Clerk of the Court serve a copy of this Report and Recommendation upon the parties by regular mail.

Dated:      September 15, 2005
            Syracuse, NY

G:\socialsecurity\ford.wpd

David E. Peebles
U.S. Magistrate Judge

-42-